UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

E.B., et al.,

        Plaintiffs,

            ORDER

   - against -

            CV 2002-5118 (CPS)(MDG)

NEW YORK CITY BOARD OF EDUCATION, et al.,

        Defendants.
- - - - - - - - - - - - - - - - - - - -X

  Plaintiffs are a class of disabled children who bring this action against defendants the New York City Board of Education, the New York City Department of Education ("DOE"), and Joel Klein, the Chancellor of the New York City School District, alleging violations of 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, et seq. Plaintiffs claim that under defendants' policies, plaintiffs and other disabled students are illegally excluded from school without notice of their right to a hearing, and that during this period of exclusion they do not receive a free and appropriate public education.

  Plaintiffs move to compel defendants to produce documents withheld under a claim that they are protected from disclosure by the deliberative process and/or self-critical analysis privileges. At this Court's request, defendants submitted the documents at

issue for <u>in camera</u> review.[1]  For the reasons set forth below, plaintiffs' motion is granted.

## **DISCUSSION**

<u>Deliberative Process Privilege</u>

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." <u>Tigue v. U.S. Dep't of Justice</u>, 312 F.3d 70, 76 (2d Cir. 2002); <u>Grand Cent. P'ship, Inc. v. Cuomo</u>, 166 F.3d 473, 482 (2d Cir. 1999).  The rationale underlying the privilege is that "those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."  <u>Grand Cent.</u>, 166 F.3d at 481 (quoting <u>United States v. Nixon</u>, 418 U.S. 683, 705 (1974)).

To qualify for protection under the deliberative process privilege, a document must be both "predecisional" and "deliberative."  <u>Tigue</u>, 312 F.3d at 76; <u>Grand Cent.</u>, 166 F.3d at 482.  A document is predecisional "when it is prepared in order to assist an agency decisionmaker in arriving at his decision."

---

[1] Plaintiffs also seek production of additional documents (EB00717-7128) that defendants withheld under claim of the self-critical analysis privilege.  <u>See</u> Letter to Court from Matthew Stewart dated September 19, 2005 at 2 n.9.  However, because those documents were not produced for <u>in camera</u> inspection, they are not addressed by this order.  If the parties are unable to reach an agreement on those documents after receiving this order, those documents must be produced for <u>in camera</u> inspection, but only after the parties confer on the Bates numbers of the documents involved.

Tigue, 312 F.3d at 80; Grand Cent., 166 F.3d at 482. The privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Tigue, 312 F.3d at 80; Grand Cent., 166 F.3d at 482. However, "the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." Tigue, 312 F.3d at 80; Grand Cent., 166 F.3d at 482. The document must have been created to assist the agency in the formulation of a specific decision on policy rather than "part of a routine and ongoing process of agency self-evaluation." Tigue, 312 F.3d at 80 (quoting Maricopa Audubon Soc'y v. U.S. Forest Serv., 108 F.3d 1089, 1094 (9th Cir. 1997)); see also Grand Cent., 166 F.3d at 482 (courts require a showing that "pinpoint[s] the specific agency decision to which the document correlates"). By contrast, explaining or interpreting an existing policy or measuring compliance with existing procedures is not predecisional, and thus is not privileged. See Turkmen v. Ashcroft, No. 02-CV-2307, 2004 U.S. Dist. LEXIS 14537, at *8 (E.D.N.Y. July 29, 2004); Powell v. New York City Health & Hosps. Corp., No. 03 Civ. 3264, 2003 WL 22871908, at *1 (S.D.N.Y. Dec. 4, 2003); Tortorici v. Goord, 216 F.R.D. 256, 258 (S.D.N.Y. 2003); Nat'l Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 88, 97 (S.D.N.Y. 2000).

A document is deliberative when it is "actually . . . related to the process by which policies are formulated." Grand Cent., 166 F.3d at 482; Hopkins v. U.S. Dep't of Hous. & Urban Dev., 929

F.2d 81, 84 (2d Cir. 1991). The privilege does not extend to "purely factual, investigative matters" nor "factual observations." EPA v. Mink, 410 U.S. 73, 89 (1973); Grand Cent., 166 F.3d at 482; Hopkins, 929 F.2d at 85. "Thus, factual findings and conclusions, as opposed to opinions and recommendations are not protected." Reino de Espana v. Am. Bureau of Shipping, 2005 WL 1813017, at *11 (S.D.N.Y. Aug. 1, 2005).

Nor are comments relating to the adequacy of personnel and equipment or other logistical issues protected because they are not policy matters. Haus v. City of New York, No. 03 Civ. 4915, 2004 WL 3019762, at *3 (S.D.N.Y. Dec. 29, 2004); Turkmen, 2004 U.S. Dist. LEXIS 14537, at *16; Nat'l Congress, 194 F.R.D. at 93, 95. Indeed, "routine operating decisions cannot be transformed into policy formulation at the highest levels of government simply because they are made at public institutions." Mitchell v. Fishbein, 227 F.R.D. 239, 251 (S.D.N.Y. 2005) (quoting Torres v. City Univ. of New York, 1992 WL 380561, at *7 (S.D.N.Y. Dec. 3, 1992)); Scott v. Board of Ed. of the City of East Orange, 219 F.R.D. 333, 337 (D.N.J. 2004).

Since the deliberative process privilege is a qualified privilege, if it is found to apply, the court must weigh the various competing interests for and against disclosure. See Mr. and Mrs. B v. Bd. of Educ., 35 F. Supp.2d 224, 228 (E.D.N.Y. 1998); United States Postal Serv. v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 165 (E.D.N.Y. 1994). Factors the courts consider in balancing the parties' competing interests include:

> 1) the relevance of the evidence to be protected; 2) the
> availability of other evidence; 3) the "seriousness" of
> the litigation and the issues involved; 4) the role of
> the government in the litigation; and 5) the possibility
> of future timidity by government employees who will be
> forced to recognize that their secrets are violable.

Phelps Dodge, 852 F. Supp. at 165; Torres, 1992 WL 380561, at *7.

The documents withheld by defendants under the deliberative process privilege can be divided into three categories: 1) draft flowcharts outlining the special education suspension process (EB004897-4902); 2) proposals for DOE's electronic data management (EB006229-6235); and 3) on-site reviews of suspension centers and suspension hearing centers (EB004903-5012), (EB005041-5112).

### Draft Flowcharts

Defendants claim that the draft flowcharts reflect advisory opinions and recommendations, including proposals to improve the capability of DOE's computer databases. Declaration of Linda Wernikoff dated September 9, 2005 ("Wernikoff Decl.") at ¶ 8. However, with the exception of a few sentences alleged to be proposals for "short-term" as well as "long-term" procedures, the draft flowcharts merely outline the existing special education suspension process rather than set forth proposals for new policy. As explained by Linda Wernikoff, the Deputy Superintendent of the Office of Special Education Initiatives, the draft flowcharts were created "to clarify the process for special education suspensions, as well as to improve the current system." Wernikoff Decl. at ¶ 5. Rather than assisting in the formulation of a specific decision on policy, see Tique, 213 F.3d at 80; Grand Cent., 166 F.3d at 482, the charts provide "the explanation, interpretation,

-5-

or application of an existing policy . . . ." Turkmen, 2004 U.S. Dist. LEXIS 14537, at *8; see Powell, 2003 WL 22871908, at *1; Tortorici, 216 F.R.D. at 258. As such, they are not predecisional and thus not privileged. Id.

To the extent that the documents contain proposals regarding what information should be included in DOE's computer database, that is not the type of policy oriented judgment the deliberative process privilege is designed to protect. See Tigue, 213 F.3d at 80; Hopkins, 929 F.2d at 84; Mitchell, 227 F.R.D. at 250-51 (privilege only extends to "communications designed to directly contribute to formulation of important public policy"). Recommendations concerning database management relating to a "routine operating decision" rather than policy formulation do not qualify for deliberative process privilege protection. See Mitchell, 227 F.R.D. at 250-51 (decision whether to recertify attorney was "routine" and cannot qualify for the deliberative process privilege); Haus, 2004 WL 3019762, at *3 (logistical issues "are not matters of policy for which the deliberative process privilege was designed"); Scott, 219 F.R.D. at 337 (termination of employee was routine operating decision not shielded by privilege); Nat'l Congress, 194 F.R.D. at 93 (decision on where to relocate police unit was not policy-oriented decision protected by privilege).[2]

---

[2] Even in cases where logistical decisions implicate matters of life and death, courts have held that they are not issues of policy. See Haus, 2004 WL 3019762, at *3 (logistical issues concerning the policing of a large demonstration); Nat'l Congress, 194 F.R.D. at 93 (identifying site to relocate Street Crime Unit).

### Proposals for DOE's Electronic Data Management

Defendants assert that the documents containing proposals for DOE's electronic data management "reflect a technical overview concerning proposed changes to the DOE's [electronic database]" including "specific, enumerated proposals and suggestions regarding data reports, management reports and follow-up strategy." Declaration of Michele Cahill dated September 9, 2005 ("Cahill Decl.") at ¶ 13; Declaration of Rose Albanese-Depinto dated September 9, 2005 ("Albanese-Depinto Decl.") at ¶ 11.

Assuming that these documents consist of proposals for future action rather than explanations of the current system, changes to DOE's computer system and other data management processes are "routine operating decisions," not policy formulation warranting protection from disclosure. See Mitchell, 227 F.R.D. at 251; Scott, 219 F.R.D. at 337; Haus, 2004 WL 3019762, at *3; Nat'l Congress, 194 F.R.D. at 93, 95. "The Privilege is properly limited to communications relating to policy formulation at the higher levels of government; it does not operate indiscriminately to shield all decision-making by public officials." Scott, 219 F.R.D. at 337; see Grand Cent., 166 F.3d at 482; Mitchell, 227 F.R.D. at 250. Indeed, in their affidavits, defendants fail to identify any important policy formulation to which the documents directly contributed. Thus, these documents should be produced.

### On-Site Reviews

The third category consists of three types of documents: 1) on-site reviews of Regional Suspension Centers (EB004903-4908); 2) on-site reviews of Alternative Instruction Sites ("AIS")

(EB004920-5003); and 3) on-site reviews of Suspension Hearing Centers (EB004909-4919), (EB005004-5012), (EB005041-5042). These documents were generated as a result of on-site reviews to evaluate the DOE's performance at various DOE facilities. The documents primarily contain factual observations of the reviewers and the results of their interviews with DOE personnel. The documents also include recommendations from either the reviewers or the DOE personnel that were interviewed regarding staffing, supplies, facilities and procedures. Finally, a small number of the documents consist of charts compiling the information gathered in the reviews.

The documents concerning Suspension Center Reviews (EB004903-4908) should be produced. These documents reflect the results of a review of Suspension Centers and consists of a summary chart listing factual observations at the sites and recommendations concerning staffing and attendance procedures. As noted above, such "factual observations" are not protected by the privilege. See Mink, 410 U.S. at 89; Grand Cent., 166 F.3d at 482; Turkmen, 2004 U.S. Dist. LEXIS 14537, at *11-*12, *18. As to the recommendations, information is privileged only if created to assist the agency in the formulation of a specific decision on policy rather than as "part of a routine and ongoing process of agency self-evaluation." Tigue, 312 F.3d at 80; Haus, 2004 WL 3019762, at *3. Upon reviewing the documents in camera, they appear to have been created to measure compliance with existing procedures and therefore are not privileged. See Tortorici, 216 F.R.D. at 258; Powell, 2003 WL 22871908, at *1; Nat'l Congress,

194 F.R.D. at 97.  In any event, recommendations concerning the adequacy of staffing and attendance procedures relate to routine operating decisions and are not matters of policy to which the privilege applies.  See Mitchell, 227 F.R.D. at 251; Haus, 2004 WL 3019762, at *3; Turkmen, 2004 U.S. Dist. LEXIS 14537, at *16; Nat'l Congress, 194 F.R.D. at 93, 95.  Defendants have not identified any specific decisions on an important public policy for which these documents were created that would justify application of the privilege.

The documents reflecting the on-site reviews of Alternative Instruction Sites (EB004920-5003) are pre-printed forms with a series of questions and blank spaces for answers.  The documents reveal the results of interviews with DOE staff regarding facilities, staffing, supplies and procedures.  Although the documents primarily reflect facts regarding the operation of the AIS, the documents also contain some recommendations for improving their operation.

As discussed above, the observations and facts obtained from interviews with AIS staff are not protected by the privilege.  See Mink, 410 U.S. at 89; Grand Cent., 166 F.3d at 482; Turkmen, 2004 U.S. Dist. LEXIS 14537, at *11-*12, *18 (information is purely factual and not protected by privilege, including interviews of staff members).  This includes not only the forms containing the interviewee's responses, but a spreadsheet compiling the responses of the various AIS.  As to recommendations contained in the documents, defendants' affidavit identifies the decision to which the documents relate as the distribution of a procedural memo

"clarifying and updating suspension procedures."  Declaration of Michael Best dated September 9, 2005 ("Best Decl.") at ¶ 22. Again, measuring compliance with existing procedures is not privileged.  See Tortorici, 216 F.R.D. at 258; Powell, 2003 WL 22871908, at *1; National Congress, 194 F.R.D. at 97.  Moreover, "any materials relating to post-decisional communications, including the explanation, interpretation or application of an existing policy, are not privileged."  Turkmen, 2004 U.S. Dist. LEXIS 14537, at *8-*9.  I find that the documents were not intended to assist the agency in the formulation of a specific decision on policy, but were "part of a routine and ongoing process of agency self-evaluation."  Tigue, 312 F.3d at 80. Finally, the recommendations concerning facilities, staffing, supplies and procedures are not policy matters which the deliberative process privilege is intended to protect.  See Haus, 2004 WL 3019762, at *3; Turkmen, 2004 U.S. Dist. LEXIS 14537, at *16; Nat'l Congress, 194 F.R.D. at 93, 95.

The documents reflecting the on-site reviews of Suspension Hearing Centers (EB004909-4919), (EB005004-5012), (EB005041-5042) were created to "observe and evaluate processes, controls, record keeping and staffing at the five Hearing Centers."  Best Decl. at ¶ 40.  The documents primarily contain the reviewers' factual observations regarding record keeping, staffing and facilities, as well as recommendations regarding those issues.

Like the other documents generated by the on-site reviews, these documents are primarily factual; the observations of the reviewers and the results of interviews with hearing staff members

are unprivileged factual material.  See Mink, 410 U.S. at 89; Grand Cent., 166 F.3d at 482; Turkmen, 2004 U.S. Dist. LEXIS 14537, at *11-*12, *18.  As to the recommendations contained therein, defendants claim that the review was intended to "assess what the Hearing Centers' case loads were, what type of a backlog they had, what staff they had and their particular responsibilities, and how the Hearing Centers were handling their caseloads."  Best Decl. at ¶ 38.  Because the review measured compliance with existing procedures, it is not privileged.  See Tortorici, 216 F.R.D. at 258; Powell, 2003 WL 22871908, at *1; Nat'l Congress, 194 F.R.D. at 97.

In short, defendants have not demonstrated that the recommendations were created to assist the agency in the formulation of a specific decision.  See Tigue, 312 F.3d at 80.  Moreover, the recommendations contained in the documents relate to issues of staffing, training and record keeping, not matters of important public policy.  See Mitchell, 227 F.R.D. at 251; Haus, 2004 WL 3019762, at *3; Turkmen, 2004 U.S. Dist. LEXIS 14537, at *16; National Congress, 194 F.R.D. at 93, 95.

Self-Critical Analysis Privilege

The self-critical analysis privilege "has led a checkered existence in the federal courts."  Wimer v. Sealand Serv., Inc., 1997 WL 375661, at *1 (S.D.N.Y. July 3, 1997).  Neither the Second Circuit nor the Supreme Court have recognized the privilege.  In Univ. of Penn. v. EEOC, 493 U.S. 182, 188-95 (1990), the Supreme Court refused to recognize a privilege for peer review materials

based on the same policy grounds as those underlying the self-critical analysis privilege. Many courts in this Circuit have flatly rejected it, and this Court finds those decisions persuasive. See, e.g., Roberts v. Hunt, 187 F.R.D. 71, 75 (W.D.N.Y. 1999); Franzon v. Massena Memorial Hosp., 189 F.R.D. 220, 224 (N.D.N.Y. 1999); Boyd v. City of New York, 1987 WL 6915, at *2; see also Cruz v. Coach Stores, Inc., 196 F.R.D. 228, 232 (S.D.N.Y. 2000) ("[T]he Court is doubtful it should be recognized at all").

To the extent that such a privilege exists, it is designed to "protect a party's confidential analysis of its own performance when that analysis tries to correct problems, on the assumption that disclosure of the analysis during litigation may deter future candid reviews." In re Ashanti Goldfields Sec. Litig., 213 F.R.D. 102, 104 (E.D.N.Y. 2003). The privilege is "premised on the notion that disclosure of documents reflecting candid self-examination will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards." Mitchell, 227 F.R.D. at 252 (quoting Reilly v. Metro-North Commuter R.R. Co., 1995 WL 105286, at *1 (S.D.N.Y. March 13, 1995)). Any protection afforded is limited to evaluative analysis; factual materials must be disclosed. See Robinson v. United States, 205 F.R.D. 104, 108-09 (W.D.N.Y. 2001); Spencer v. Sea-Land Serv., Inc., No. 98 CIV 2817, 1999 WL 619637, at *1 (S.D.N.Y. Aug. 16, 1999); Wimer, 1997 WL 375661, at *1; Troupin, 169 F.R.D. at 550.

The party asserting the privilege bears the burden of

establishing it by a "'detailed and convincing showing' of the harm to be anticipated from the disclosure." In re Ashanti, 213 F.R.D. at 104 (quoting In re Nieri, No. Civ.A. M12-329, 2000 WL 60214, at *3 (S.D.N.Y. Jan. 24, 2000)). "At a minimum, the party invoking the privilege must demonstrate that 'the information . . . result[ed] from a critical self-analysis undertaken by the party seeking protection; [that] the public [has] a strong interest in preserving the free flow of the type of information sought; [and that] the information [is] of the type whose flow would be curtailed if the discovery were allowed." Mitchell, 227 F.R.D. at 252 (quoting Wimer, 1997 WL 375661, at *1). The information sought must also have been prepared "with the expectation it would remain confidential and must have, in fact, been kept confidential." In re Ashanti, 213 F.R.D. at 104-05 (quoting Spencer, 1999 WL 619637, at *2). Once the above showing is made, the court must weigh the requesting party's need for the information against the potential harm caused by disclosure. See In re Ashanti, 213 F.R.D. at 104; Robinson, 205 F.R.D. at 110; Metro. Life Ins. Co. v. Troupin, 169 F.R.D. 546, 548 (S.D.N.Y. 1996).

    Defendants invoke the self-critical analysis privilege to protect from disclosure the on-site reviews of Regional Suspension Centers (EB004903-4908), (EB005043-5112); the on-site reviews of Alternative Instruction Sites (EB004920-5003); and the on-site reviews of Suspension Hearing Centers (EB004909-4919), (EB005004-5012), (EB005041-5042). Defendants assert that these reviews contain confidential analyses of the DOE's performance at the

facilities and were conducted "with a view towards correction of errors." See Cahill Decl. at ¶¶ 5-6; Albanese-Depinto Decl. at ¶ 7; Best Decl. at ¶¶ 25, 36, 56.  DOE officials also maintain that "[i]f this type of critical self-analysis were disclosed in the context of litigation, I would be deterred from conducting or authorizing such a candid review in the future."  See Cahill Decl. at ¶ 10; Albanese-Depinto Decl. at ¶ 10; Best Decl. at ¶¶ 27, 37, 57, 69.

As discussed earlier, these documents are primarily factual in that they reveal the reviewers' observations and the results of their interviews with staff members.[3]  Accordingly, a large portion of the documents are not covered by such a privilege. See Robinson, 205 F.R.D. at 108-09; Spencer, 1999 WL 619637, at *1; Wimer, 1997 WL 375661, at *1; Troupin, 169 F.R.D. at 550.

As to the evaluations contained in the documents, this Court is skeptical that disclosure would result in the chilling effect defendants fear.  To be sure, this Court has no reason to doubt that on-site reviews are important.  As explained by Michele Cahill, Senior Counselor for Education Policy, "successful operations within the office hinge upon our committment to continually evaluate what we do and why we do it, in order to create a support services infrastructure that always has a positive impact on student achievement, and supports New York

---

[3] Although some of the documents reflecting the on-site reviews of Regional Suspension Centers (EB005043-5112) were not discussed above because the deliberative process privilege was not asserted as to those documents, documents EB005043-5112 contain the same type of information as EB004903-4908 discussed above.

City's Children First agenda." Cahill Decl. at ¶ 8. If the DOE's success indeed "hinge[s]" on these reviews, see id., this Court questions whether a governmental agency would cease conducting such reviews in the future to avoid their disclosure in litigation. See Robinson, 205 F.R.D. at 109-10 ("implausible to believe that the Post Office would cease its practice of investigating accidents and writing up the results, in order to prevent future accidents, on the basis that such reports could be discoverable"); Boyd v. City of New York, No. 86 Civ. 4501, 1987 WL 6915, at *2 (S.D.N.Y. Feb. 11, 1987) (rejecting the "cynical view of municipal agencies" that if investigations are disclosed they will not be honest and candid); see also In re Ashanti, 213 F.R.D. at 105 (disclosure would not impede future self-critical analysis because of incentives to correct problems); Cruz, 196 F.R.D. at 232-33 (private "company has an obvious economic interest in engaging in self-evaluations of employee misconduct"); Abbott v. Harris Publications, No. 97 Civ. 7648, 1999 WL 549002, at *2 (S.D.N.Y. July 29, 1999) (while defendant "no doubt would prefer that the information not be made public, the fact that the results might be discoverable in civil litigation will not deter them from doing what their business interest requires"); Spencer, 1999 WL 619637, at *3 (company "has significant incentives to assess and correct malfunctions in its equipment and to undertake corrective measures to avoid future accidents"). If, as Ms. Cahill attests, failing to conduct a candid self-evaluation "is harmful both to the DOE, as well as to the student population that the DOE serves," Cahill Decl. at ¶ 11, a municipal agency like the

DOE has a compelling incentive to continue to evaluate its own performance. See Lizotte v. New York City Health and Hosps. Corp., No. 85 Civ. 7548, 1989 WL 260217, at *5 (S.D.N.Y. Nov. 28, 1989) (assuming that municipal decision-makers "are professionally motivated to seek improvements in their ability to deliver health care and that the possibility that some of their analysis and comments may be disclosed . . . will not deter them"); Boyd, 1987 WL 6915, at *2 ("Frank and self-critical investigation is, in my view, more likely required by the pressure of public scrutiny than discouraged by it"). In any event, defendants fail to explain why a protective order would not eliminate the harm that a broader disclosure might cause. See Haus, 2004 WL 3019762, at *4; Melendez v. Greiner, No. 01 Civ. 07888, 2003 WL 22434101, at *7 (S.D.N.Y. Oct. 23, 2003); Lizotte, 1989 WL 260217, at *5; King v. Conde, 121 F.R.D. 180, 190 (E.D.N.Y. 1988).

Even assuming that defendants' claim of a chilling effect is valid, plaintiffs' need for the documents requested outweighs any potential harm caused to the defendants by disclosure. Plaintiffs allege that defendants' disciplinary process and procedures illegally exclude disabled students from school without notice of a hearing and deny those students a free and appropriate public education. Since plaintiffs seek information detailing how various DOE facilities implement the subject policies and procedures, the information requested is directly relevant to plaintiffs' claims. Thus, even if a self-critical analysis privilege is applicable in this federal case, this Court finds that defendants have not met their heavy burden of showing that

the public interest in shielding the information from disclosure outweighs plaintiffs' need for the information.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to compel is granted.

**SO ORDERED.**

Dated:   Brooklyn, New York
         December 1, 2005

                                    /s/
                                    MARILYN D. GO
                                    UNITED STATES MAGISTRATE JUDGE